JjDREW, J.
LSU Health Sciences Center-Shreveport (LSUHSC-S) and Dr. Anthony Tran[1] appealed a judgment ordering them to repay payments received for medical treatment of $72,918.43 and $23,219.15, respectively. The trial court based the judgment on a health policy exclusion for injury sustained while performing an illegal act. As-surecare, Inc., the administrator of Holden Business Forms Co., Inc.’s[2] self-insured medical plan, paid for treatment of an employee’s husband injured in a motorcycle crash. LSUHSC-S and the doctor urged that a provision excluding coverage for injury suffered while performing an illegal act was inapplicable; alternatively, if the exclusion applied, then the insurer was in the best position to evaluate whether the policy exclusion applied. Moreover, the payments, made for services rendered, were not gratuitous.
We affirm.
FACTUAL AND PROCEDURAL BACKGROUND
Holden Business Forms Co., Inc. employed Candy Hughes, the wife of Jimmy Hughes, a covered dependent on Holden’s self-insured medical plan. On May 8, 1998, Jimmy Hughes was severely injured in a motorcycle accident. Two blood samples were drawn. The first had a blood alcohol content (BAC) of .212. The second sample had a BAC of .13. LSUHSC-S and Tran treated Hughes for about a month, and his medical bills were paid by Assureeare, Inc., the administrator of Hol *88 den’s medical plan. The policy excluded coverage for illness or injury “caused, or contributed to, by ^engagement in an illegal occupation or commissions or attempt to commit a misdemeanor and/or felony.”
According to Holden, despite its diligent efforts, it was unable to obtain a copy of the accident report until months after the accident when Holden learned Hughes was drunk at the time of the crash. Holden filed suit for a refund of its medical payments based upon its policy exclusion for payments for injury caused while committing a felony or misdemeanor (DWI). Hughes was never convicted of any crime in connection with this accident, as he died in a 2002 fire. The criminal charges were nolle prossed in 2003 with the notation, “Defendant is deceased.”
A summary judgment in favor of Holden was reversed by this court in Holden Business Forms Co., Inc. v. LSUHSC-S, et al., 35,694 (La.App. 2d Cir.2/27/02), 811 So.2d 1102. This court found that affidavits supporting the summary judgment were not based upon personal knowledge. The matter was remanded for further proceedings.
At the July 14, 2004, bench trial, the record of the prior appeal and a number of depositions were placed into evidence. The state trooper investigating at the scene noticed the heavy smell of alcohol on Hughes’ breath as he lay in the ditch next to his motorcycle. The trooper described Hughes’ companion as “profoundly drunk.” Another trooper went to LSUHSC-S to have blood collected from Hughes. The state police crime lab analyzed that sample taken at 9:18 p.m. and found the blood alcohol level to be .13. A sample drawn a bit earlier and analyzed at LSUHSC-S found Hughes’ blood alcohol level to be .212.
| .-¡Hughes was treated at LSUHSC-S from May 8 until May 23, 1998. LSUHSC-S and the doctor filed their claims on June 9, 1998, and Assurecare paid the claims on July 28, 1998. The CEO of Assurecare stated that at the time the claims for Hughes’ medical treatment were paid, Assurecare had no knowledge of the blood alcohol levels. According to Assurecare’s CEO, Holden requested a copy of the police report but did not receive a copy until December 1998 and did not get information about Hughes driving under the influence until after the claims were paid. In January 1999, Assurecare learned about the blood alcohol tests results and first requested a copy of the lab reports in February 1999. Hughes was charged with DWI in the 26th JDC and failed to appear on August 12, 1998, when his bond was forfeited and a warrant issued.
Based upon Hughes’ drunken condition while driving, Holden sought to recover the payments in an action brought in April 2000. The Holden CEO stated it was Holden’s intention not to cover anyone injured during an illegal act; the exclusion was intended to apply even if the person was not convicted of an illegal act.
REASONS FOR JUDGMENT
Relying on the two blood alcohol tests and the trooper’s observations at the accident scene, the trial court found that the preponderance of the evidence was that Hughes was driving his motorcycle while intoxicated. In addition, the trial court stated:
• The court had no authority to find that the coverage exclusion of illegal activity was against public policy.
1The exclusion of coverage for illegal activity was clear and unambiguous, since it simply prohibited medical benefits payment for injuries resulting from commission of illegal activity.
*89 • Having an accident while clearly under the influence of alcohol sufficient to constitute a misdemeanor or a felony triggers the policy exclusion.
• The health plan could be hable for penalties if it did not pay promptly. If Hughes had turned out not to be DWI, the plan could have been hit with large penalties. The plan paid because it had no real choice.
• Under the Civil Code, the plan was entitled to recover funds that it paid but did not owe.
DISCUSSION
We reject the health care providers’ argument that the policy exclusion does not apply because Hughes was never convicted of a misdemeanor or a felony, terms used in the policy exclusion. As previously noted, Hughes died of unrelated causes resulting in the pending DWI prosecution being dismissed.
LSUHSC-S and the doctor correctly observed that insurance policy exclusions must be narrowly construed and that the state and federal constitutions mandate that a person is presumed innocent until proven guilty. Moreover, Holden had the burden of proving it was entitled to a refund.
The rules governing interpretation of insurance policies are well settled. A contract between the parties, the insurance policy should be construed by using the general rules of interpretation in the Louisiana Civil Code. If the wording is clear and unambiguous concerning the parties’ intent, the insurance policy must be enforced as written. Whether contract | ^language is clear and unambiguous is a question of law. Words and phrases in insurance policies are to be construed using their plain, ordinary, prevailing meaning, unless the words have acquired a technical meaning. The policy should not be construed in an unreasonable, strained manner under the pretense of contractual interpretation. Rules of construction do not permit a perversion of words to create an ambiguity where none exists. If the policy clearly and unambiguously expresses the intention of the parties, the insurance policy must be enforced as written. Courts lack the authority to alter terms of insurance policies which are unambiguous. Edwardd v. Daugherty, 2003-2103 (La.10/1/04), 883 So.2d 932.
Had the parties to the health plan intended that the exclusion apply only upon conviction of a crime, then the policy could have so provided. As used in this contract, “felony” and “misdemeanor” are not technical terms, but are words describing behavior which constitutes a crime or an attempted crime. Holden correctly points out that to construe “felony” and “misdemeanor” in the health plan to require a conviction would lead to absurd consequences. An insured who died of injuries sustained while committing or attempting to commit a “felony” and “misdemeanor” would be entitled to coverage if the death occurred before prosecution and conviction. In contrast, an insured who survived the injuries and subsequently was prosecuted and convicted of criminal behavior would not be entitled to coverage based upon the exclusion in the health plan.
| fiThis record contains proof that Hughes was engaged in criminal behavior,[3] driving a motorcycle while intoxicated, which caused or contributed to the injuries for which the administrator of Holden’s self-insured medical plan paid. The trial court correctly found that the policy exclusion was clear, unambiguous, and applicable even though Hughes was not convicted *90 of a crime arising out of Ms conduct resulting in his injuries. A conviction is not required in order for the illegal behavior exclusion to be applicable.
The alternative position of LSUHSC-S and the doctor is that even if the policy exclusion applied, Holden’s payments made by mistake were not gratuitous but were paid for medical services provided. Moreover, the employer and its plan administrator were in the best position to know of the exclusion, and there is no evidence that the defendant hospital and doctor knew of the exclusion when they submitted their claims.
This employer filed a similar action in the state of Texas to recover medical payments for Hughes’ treatment in that state after he left LSUHSC-S. The Texas court refused to permit Holden to recover its payments based upon the policy exclusion. Between two innocent parties, the Texas court found that the loss should be placed upon the party that mistakenly created the situation and was in the best position to have avoided it. While Holden relied upon not receiving the accident report from the state police, the Texas court pointed out that Holden did not discuss getting Hughes’ medical records, which would have undoubtedly contained the |7blood test result. There was no evidence in the Texas court as to what efforts Holden made to get information about the accident from Hughes or his wife or to have Hughes sign a release for his medical records. Holden Business Forms Co. v. Columbia Medical Center of Arlington Subsidiary, L.P., 83 S.W.3d 274 (Tex.App. Ft. Worth 2002).
La. C.C. art. 2302 states:
A person who paid the debt of another person in the erroneous belief that he was himself the obligor may reclaim the payment from the obligee. The payment may not be reclaimed to the extent that the obligee, because of the payment, disposed of the instrument or released the securities relating to the claim. In such a case, the person who made the payment has a recourse against the true obligor.
LSUHSC-S and the doctor maintain that C.C. art. 2302, read as a whole, indicates this court may consider the equities when a party who made an erroneous payment seeks to recover the funds, not from the debtor, but from a third party creditor which received the payment. Holden’s position is that the enactment of La. C.C. art. 2302 in 1995 was a substantive change in the law, since prior to that C.C. arts. 2302 and 2303 provided that a person who paid through mistake could not reclaim what had been paid if the payee was actually owed the money. The employer contended that art. 2302, which became effective January 1, 1996, provides that a person who paid by mistake may recover it even if such a debt is owed to the creditor.[4]
| RPrior to the 1995 revision of the relevant portion of the Civil Code, La. C.C. art. 2301 stated:
He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he unduly received it.
*91 That corresponding article to the former art. 2801 is art. 2299 in the 1995 revision, which now provides:
A person who has received a payment or a thing not owed to him is bound to restore it to the person from whom he received it.
The former La. C.C. art. 2302 stated: “He who has paid through mistake, believing himself a debtor, may reclaim what he has paid.” There is no corresponding article in the 1995 revision to the former art. 2302.[5] Likewise, there is no corresponding article in the 1995 revision for the former article 2303, which stated:
To acquire this right, it is necessary that the thing paid be not due in any manner, either civilly or naturally. A natural obligation to pay will be sufficient to prevent recovery.
The present La. C.C. art. 2302 is based upon the former C.C. art. 2310, which provided:
He who, through mistake has paid the debt of another to whom he believed himself indebted, has a claim to restitution from the creditor.
This right ceases, if, in consequence of the payment, the creditor has destroyed or parted with his title; but the recourse still remains to the person paying against the true debtor.
The policy exclusion for illegal behavior is applicable under the facts of this case. The employer and its health plan administrator did not obtain |flthat information until after payments were made. The clear meaning of the present Civil Code articles is that a party who pays by mistake may recover from the creditor which received the erroneous payment. Without reaching the issue of responsibility for the mistake, we note there is no provision prohibiting recovery by an entity which negligently made payments of money it did not owe. LSUHSC-S presumably would have rendered the same medical treatment if Hughes had been uninsured.
While the result reached by the Texas court in the litigation between these parties appears equitable under the facts in this record, the trial court correctly found that our Civil Code dictates a contrary result. A person who paid the debt of another person in the erroneous belief that he was himself the obligor may reclaim the payment from the obligee. La. C.C. art. 2302.
DECREE
The judgment of the trial court is affirmed at the cost of LSUHSC-S and Dr. Tran. The total costs of the trial and appellate courts are $1,212.40, which include $25 due the Second Circuit Court of Appeal for an appellate brief extension.
AFFIRMED.

. The record shows Dr. Tran's whereabouts are apparently unknown.

. The employer and the health plan administrator are referred to jointly as "Holden” throughout the opinion.

. See La. R.S. 14:98.

. Holden relied upon In re Dowden, 207 B.R. 514 (W.D.La.1997), as support for its contention that after 1996, the law changed so that a party which paid by mistake could recover funds even if the funds were actually owed. Since the present dispute began in 1998, it is not necessary for this court to address Holden’s contention that, prior to 1996, it could not have recovered from LSUHSC-S and the doctor, since the debt was owed for services performed.

. Joseph Dainow, Editor, 1972 Compiled Edition of the Civil Codes of Louisiana, Vol. 17. See Tables 53 and 54, 2005 Pocket Part.